UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WEBSTER RASHADA,

    Plaintiff,

v.

UKNOWN ODUNGUA, *et al*,

    Defendants.
_____/

Case No. 1:22-cv-1017

Hon. Jane M. Beckering

## REPORT AND RECOMMENDATION

Plaintiff Webster Rashada ("Rashada") is a prisoner in the custody of the Michigan Department of Corrections (MDOC). Rashada filed this civil rights lawsuit alleging the use of excessive force against Corrections Officer (CO) Lawrence Odunuga (named as "Unknown Odungua"), CO Cody Rees (named as "Unknown Rees"), CO Michael Montoya (named as "Unknown Montoya"), CO Marcus Ledesma (named as "Unknown Ledesma"), and CO Sean Dunn (named as "Unknown Dunn"). This matter is now before the Court on defendants' motion for summary judgment (ECF No. 17). Rashada did not oppose defendants' motion.[1]

    **I.**    **Rashada's complaint**

The alleged incidents occurred at the MDOC's Ionia Correctional Facility (ICF). Compl. (ECF No. 1, PageID.3). Rashada set forth the following allegations:

> This incident occurred at Ionia Correctional Facility segregation Unit-2 A-wing on June 29, 2022 when c/o Rees placed handcuffs on Plaintiff with the

---

[1] W.D. Mich. LCivR 7.2(c) states that "any party opposing a dispositive motion shall, within twenty-eight (28) days after service of the motion, file a responsive brief and any supporting materials."

1

assistance of c/o Montoya to pull Plaintiff out of his cell #36 for his L.O.P / Loss of privilege yard break to go outside in the Unit-2 segregation yard cages.

As c/o Rees was holding plaintiff [sic] arm escorting him outside with c/o Montoya assisting him, c/o Rees begin to make verbal violent threats towards Plaintiff and stated "I bet you signoff the lawsuit against c/o Sheldon after this ass beating you about to get by me and my partners."

Then befor [sic] plaintiff could enter inside the outside Unit-2 segregation yard cage, c/o Rees yanked plaintiff [sic] arm back and begin to bend plaintiff [sic] arm up while c/o Montoya assisted him bend plaintiff [sic] arm up (while Plaintiff was in handcuffs) [sic]

C/o Odungua, c/o Ledesma, and c/o Dunn came to help assist c/o Rees and c/o Montoya bend plaintiff [sic] arms up and escort plaintiff back into the unit. While escorting plaintiff back into the Unit. While escorting plaintiff back into the unit c/o Rees, c/o Montoya, c/o Odungua, c/o Ledesma, and c/o Dunn slammed plaintiff [sic] head into the middle metal pole in between the two open doors.

Once the defendants got plaintiff inside the unit the defendants slammed plaintiff on his head on the ground.

While plaintiff was on the ground c/o Rees was on plaintiff [sci] back, bending his arms up (which cause [sic] the handcuffs to become even tighter on plaintiff [sic] wrist cutting off blood circulation.) C/o Ledesma placed ankle shackle cuffs on plaintiff [sic] ankles (extremely tight.) The Defendants picked plaintiff off the ground and bended plaintiff [sic] arms escorting him all the way back to his cell #36 and closed the plaintiff [sic] door leaving plaintiff in his cell #36 with the handcuffs left on his wrist (extremely tight cutting off blood circulation.) And the ankle shackle cuffs on plaintiff [sic] ankles as well. Plaintiff suffered shoulder joints pain for 3 weeks, numbness in plaintiff [sic] left hand for 2 weeks, pain and lump on top of plaintiff [sic] head. Plaintiff also suffered dizzyness [sic], light head, and very bad headaches for 3 months. (See Exhibits - G, H, and I attached.) Plaintiff previously gave a medical health care kite complaint to the nurse (RN Ruth Bartlett) literally right befor [sic] plaintiff was assaulted by the defendants that morning to aware [sic] medical service, mental health service and other authority (see Exhibit – F) Plaintiff told (Deputy Warden Bonn) that same morning befor [sic] the incident, about plaintiff being threaten [sic]. (See Exhibit – A)

Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages. . . .

> The defendants violated plaintiff rights under the federal Constitution and laws of the United States that falls under the following claims; Plaintiff sues under, First Amendment retaliation claim and Eighth Amendment excessive force claim.

Compl. (ECF No. 1, PageID.3-8) (emphasis omitted).

### II.  Defendants' motion for summary judgment

### A.  Legal standard for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).

"In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  As discussed, prisoner Rashada did not file a response in opposition to the motion for summary judgment.  "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  The trial court is required to "intelligently and carefully review the legitimacy of such unresponded-to motion" and cannot "blithely accept the conclusions argued in the motion." *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 407 (6th Cir. 1992).  However, when a motion for summary judgment is unopposed, "[n]othing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record" to demonstrate the existence of genuine issues of material fact. *Id.* at 405.

### B.    First Amendment retaliation claim

Rashada seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

To prove a First Amendment retaliation claim, a plaintiff must establish three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two -- that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

A prisoner must be able to prove that the exercise of the protected right was the substantial and motivating factor in the defendant's alleged retaliatory conduct.

> As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech. If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim.

*Nieves v. Bartlett*, -- U.S. --, 139 S. Ct. 1715, 1722 (2019) (internal quotation marks and brackets omitted).

Here, defendants contend that there is no causal connection between the alleged protected conduct (Rashada filing a lawsuit against former MDOC CO Sheldon on November 1, 2021, *Rashada v. Sheldon, Burrgren, Scott, and Wells*, 1:21-cv-919 (W.D. Mich.) (the "*Sheldon* lawsuit")) and the alleged adverse action (defendants' use of excessive force while escorting Rashada on June 29, 2022). In the *Sheldon* lawsuit, Rashada alleged that CO Sheldon violated his constitutional rights on November 17, 2020, when Sheldon became "aggressive" while escorting Rashada to his cell after COVID-19 testing. *See Sheldon* lawsuit at ECF Nos. 1 and 7. On November 24, 2020, Sheldon resigned from the MDOC. *See* Towns' Decl. (Aug. 28, 2023)

5

(ECF No. 19-1).  Rashada did not file the *Sheldon* lawsuit until November 1, 2021, almost one year after Sheldon's resignation.  *See Sheldon* lawsuit at ECF No. 1.

It is unclear whether Sheldon was aware of the lawsuit because he was never served with a complaint.  In response to an attempted waiver of service, MDOC's counsel advised the Marshals Service: that Sheldon was a former employee; that Sheldon did not respond to attempts to contact him or leave a forwarding address; and, that there was some "chatter" that Sheldon had moved to Florida.  *Id*. at ECF No. 33.  Ultimately, this Court dismissed the *Sheldon* lawsuit on October 25, 2022, noting that Sheldon was no longer employed at the MDOC and there was no valid address to serve him.  *Id*. at ECF Nos. 45 and 46.

The evidence in the record does not support Rashada's claim that defendants Odunuga, Rees, Montoya, Ledesma, or Dunn were aware of the *Sheldon* lawsuit, that defendants discussed the lawsuit with Sheldon, or that the *Sheldon* lawsuit was the substantial and motivating factor in the alleged use of force against Rashada.  While defendants Odunuga, Rees, Montoya, and Dunn were aware that CO Sheldon had worked at ICF, they had no communication with Sheldon since his resignation. *See* Odunuga Decl. (ECF No. 18-4, PageID.114) ("I am aware that there was a former officer at ICF with the last name Sheldon.  He resigned from ICF several years ago and I have had no communication with him since his resignation."); Rees Decl. (ECF No. 18-3, PageID.108) ("I am aware that there was a former officer at ICF with the last name Sheldon.  He resigned from ICF several years ago and I have had no communication with him since his resignation. I never referenced or discussed any lawsuit Rashada may have against Sheldon during Rashada's escort, nor did I state that Rashada was going to get an 'ass-beating'."); Montoya Decl. (ECF No. 18-2, PageID.100-101) ("I am aware that there was a former officer at ICF with the last name Sheldon.  He resigned from ICF

several years ago and I have had no communication with him since his resignation. During the relevant escort, CO Rees never referenced or discussed any lawsuit Rashada may have against Sheldon, or did CO Rees state that was going to get an 'ass-beating'."); and, Dunn Decl. (ECF No. 18-5, PageID.120) ("I am aware that there was a former officer at ICF with the last name Sheldon.  He resigned from ICF several years ago and I have had no communication with him since his resignation."). For his part, defendant Ledesma stated that "I have never worked or spoken with a former officer from ICF with the last name Sheldon."  Ledesma Decl. (ECF No. 18-6, PageID.125).

Rashada's retaliation claim is based on CO Rees' reference to the ongoing *Sheldon* lawsuit and Rees' announcement that Rashada would "sign off" on the lawsuit after he and his partners gave Rashada an "ass beating."  The evidence establishes that the alleged conversation did not occur, *i.e.*, Rees did not discuss the *Sheldon* lawsuit with Rashada and did not threaten to give Rashada an "ass beating" while they escorted him from the unit to the yard. *See* Rees Decl. and Montoya Decl.  In addition, defendants contend that Rashada failed to establish a causal connection between the *Sheldon* lawsuit and the retaliatory conduct alleged in the present lawsuit.  Rashada presented no evidence as to how defendants were aware that he had an ongoing lawsuit against Sheldon.  As discussed, Rashada filed the lawsuit about one year after Sheldon left the MDOC, Sheldon was never served with the complaint, and Sheldon was not in contact with defendants. In addition, Rashada presented no evidence to establish a connection between defendants and Sheldon which would motivate defendants to engage in retaliatory conduct.  None of the defendants had communicated with Sheldon since he resigned from the MDOC in November 2020.  Based on this record, the Court concludes that a jury could not reasonably find that defendants were motivated to retaliate against Rashada based on an

unserved complaint against a former MDOC employee who had no connection to defendants. Accordingly, defendants should be granted summary judgment on Rashada's retaliation claim.

### C.    Eighth Amendment excessive force claim

The Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of a crime. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *See Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Eighth Amendment also prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain." *Rhodes*, 452 U.S. at 346. Among unnecessary and wanton inflictions of pain are those that are "totally without penological justification." *Id*.

Rashada's claim that defendants used excessive force is analyzed giving deference to prison officials as they attempt to maintain order and discipline within dangerous institutional settings. "Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct." *Hudson v. Palmer*, 468 U.S. 517, 526 (1984). A prison's internal security is a matter normally left to the discretion of prison administrators. *Whitley v. Albers*, 475 U.S. 312, 321 (1986). Accordingly, "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id*. at 321-22 (internal quotation marks omitted).

"Whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or

maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). In determining whether the use of force is wanton and unnecessary, the court should evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of the forceful response. *Id*. at 7.

Rashada alleged that on June 29, 2022, defendants used excessive force while escorting him back to his cell. At the time, Rashada was housed in a "Start" unit which provides an alternative to administrative segregation for prisoners who have a history of repeated disruptive behavior and who would otherwise be classified to administrative segregation. *See* Montoya Decl. at PageID.97.[2] The alleged incident occurred while Rashada was being escorted from his cell to an enclosed outdoor "yard module".[3] Prisoners are handcuffed and escorted to and from the yard module by two officers. Montoya Decl. at PageID.97. "During an escort the prisoner must look straight ahead, at no time is the prisoner to be looking at staff escorting while walking as this may be perceived as a threat." *Id*.; Towns Decl. (Aug. 23, 2023) (ICF Unit 23 Housing Unit Rules Start Population ¶ 19) (ECF No. 18-8, PageID.142).

Rashada's claim arose during his escort to the yard module on the morning of June 29, 2022. Defendants' brief includes a well-documented summary of the facts giving rise to Rashada's claim which provides as follows:

---

[2] The record reflects that Rashada was found guilty of 194 misconduct charges between December 15, 2018, and May 22, 2022. *See* Rashada's MDOC Misconduct Summary Report (ECF No. 18-11, PageID.179-183.

[3] On June 29, 2022, Rashada was serving Loss of Privileges (LOP) sanctions and was allowed a yard break seven days per month. *See* Rashada Dep. (ECF No. 18-7, PageID.133-134). In Rashada's unit, "[P]risoner yard breaks are conducted in outdoor yard modules, which are cage enclosures in the unit yard area. Once the prisoner is placed in the yard module and the door is secured, the prisoner's hand restraints are removed through the slot in the door." Montoya Decl. at PageID.97.

>CO's Rees and Montoya began Rashada's escort to the yard a little after 9 AM on the morning of June 29, 2022. (Compl., ECF No. 1, PageID.3; Defs.' Ex's. A-B.) While on the escort, Rashada kept turning his head towards CO Rees. (Defs.' Ex's. A-B; Defs.' Ex. H, Screenshots Inside Unit; Defs.' Ex. L, Authentication of Screenshots.) CO Rees gave Rashada direct orders to keep his head forward. (Defs.' Ex's. A-B.) Rashada again turned his head towards CO Rees. (*Id*.; Defs.' Ex. I, Screenshots Outside Unit; Defs.' Ex. L, Authentication.) Rashada also began threatening physical harm to CO Rees, including threatening to spit on him. (Defs.' Ex's. A-C.) CO Rees then informed Rashada that his yard time had been forfeited due to his conduct. (Defs.' Ex's. A-B.) Rashada tensed up when CO Rees and CO Montoya began to escort him back to his cell. (*Id*.) Based on his disruptive behavior and threats to spit on CO Rees, Rashada was placed in an arm lock escort. (*Id*.) Additionally, Rashada is known by all Defendants for a history of disruptive behavior, including threatening and assaulting staff at ICF on numerous occasions. (Defs.' Ex's. A-D; see also Defs.' Ex. J, Vroman Decl., Att. 1, Rashada's Misconduct Summary Report.)
>
>At this same time, CO's Odunuga and Dunn were out in the Unit 2 yard, having just escorted another prisoner to a yard module. (Defs.' Ex's. C-D.) CO Ledesma was also in the Unit 2 yard about to escort a different prisoner from a yard module back to his cell. (Defs.' Ex. E.) As CO's Odunuga and Dunn were walking over to assist CO Ledesma in escorting that prisoner, they overheard Rashada becoming loud and disruptive and threatening CO Rees. (Defs.' Ex's. C-D.) Recognizing the disturbance and Rashada's resistance to CO's Rees and Montoya, they assisted in escorting Rashada back to his cell. (*Id*.)
>
>Upon entering the housing unit, Rashada shifted his weight into CO Rees, pushing him against the wall. (Defs.' Ex's. A-D.) CO's Rees, Montoya, Dunn, and Odunuga then took Rashada to the ground to regain control of Rashada. (*Id*.) Once control was regained on the ground, CO Dunn retrieved leg restraints. (*Id*.) By this time, CO Ledesma had placed the other prisoner back into the yard module and had come into the housing unit to assist with Rashada. (Defs.' Ex. E.) CO Ledesma controlled Rashada's ankles while CO Dunn placed the leg restraints on Rashada. (Defs.' Ex's. D-E.) Once the leg restraints were secured, Rashada was brought to his feet and escorted with an arm lock escort to his cell by all Defendants. (Defs.' Ex's. A-E.) After being placed in his cell, but before the door could be completely closed, Rashada turned and spit toward the Defendants, striking CO Dunn in the face and arm. (*Id*.)

Defendants' Brief (ECF No. 18, PageID.72-74) (footnote omitted).[4]  The screen shots (ECF Nos. 18-9 and 18-10) and surveillance videos (ECF No. 18-12) are consistent with defendants'

---

[4] The cited exhibits are identified as follows: Defs.' Ex. A (Montoya Decl. ECF No. 18-2); Defs. Ex. B (Rees Decl.

summary. Defendants' declarations explained their actions and the depictions of those actions on the screenshots and videos. *See* Montoya Decl.; Rees Decl.; Odunuga Decl.; Dunn Decl.; and Ledesma Decl.

After Rashada was placed in his cell, a registered nurse came to check on him. The nurse examined Rashada at 10:06 a.m. Medical Record (ECF No. 18-11, PageID.185). Rashada complained of "head and body aches." *Id*. The nurse reported "[n]o visual injuries noted" and that Rashada's speech was "clear and articulate." *Id*. The nurse administered "Tylenol 325mg #2 packs and Ibuprofen 200mg #2 packs given for discomfort." *Id*.

Hearing officers found Rashada guilty of two Class I misconducts which occurred during the short time that defendants escorted him. First, Rashada threatened CO Rees. The Administrative Law Judge (ALJ) found Rashada guilty of Class I misconduct "012 Threatening behavior" stating in pertinent part:

> Pursuant to PD 03.03.105 threatening behavior is words, actions or other behavior which expresses an intent to injure or physically abuse another person. This Administrative Law Judge finds the reporting staff member's statement to be specific, reliable and credible. ALJ finds that the prisoner did state "you need to stop talking like this. Take these cuffs off me and you won't be talking . . . bitch, get these cuffs off me and I'll spit right in your face. Once these cuffs come off, I'm ma drag you through this slot" to the reporting staff member [CO Rees]. These words express an intent to injure or physically abuse a staff member as spitting on someone is abusive and dragging someone through the slot would be an assault. Prisoner Rashada denies he said this, but did not indicate anything he did say. . . The report is clear and persuasive. I find the prisoner guilty.

Class I Misconduct Report (Rees) (ECF No. 18-8, PageID.147).

---

ECF No. 18-3); Defs' Ex. C (Odunuga Decl. ECF No. 18-4); Defs.' Ex. D (Dunn Decl. ECF No. 18-5); Defs. Ex. E (Ledesma Decl. ECF No. 18-6); Defs.' Ex. H (Screenshots Inside Unit ECF No. 18-9); Defs.' Ex. I (Screenshots Outside Unit ECF No. 18-10); Defs.' Ex. J (Vroman Decl. (MDOC Litigation Specialist) ECF No. 18-11); and, Defs.' Ex. L (Authentication of Video Footage and Screenshots) ECF No. 18-13).

Second, Rashada spit on CO Dunn. The ALJ found Rashada guilty of Class I misconduct "008 Assault and battery (staff victim)" stating in pertinent part:

> Per PD 03.03.105, assault and battery is an intentional, non-consensual touching of another person done either in anger or with the purpose of abusing or injuring another. I find the prisoner did turn around and spit on officer Dunn's right arm, face and right eye as he was placed into his cell from yard. Prisoner Rashada only indicates that he didn't spit on the officer. However, video is consistent with him spitting on the officer. Video shows the staff placing him back into his cell. While the video doesn't show into the cell, it does show the staff jump back as he is in the cell. There would not be any reason to jump back unless he had spit at them. Per the report, he was being "disruptive on escort coming in from yard", so he was already agitated and angry. Thus, when he was placed into the cell, he turned around and spit on officer Dunn, which is an abusive contact done in anger. I find the prisoner guilty of (008).

Class I Misconduct (Dunn) (ECF No. 18-8, PageID.154).

There is no evidence to support Rashada's excessive force claim against any of the defendants. Rashada threatened CO Rees as defendants escorted him to the yard module. Rashada became disruptive when defendants escorted back to the unit. Ultimately, it required five MDOC officers to escort Rashada back to his cell, at which time Rashada continued his disruptive behavior by spitting on CO Dunn. Based on this record, defendants applied force in a good-faith effort to restore order. *See Hudson*, 503 U.S. at 6-7. Accordingly, defendants should be granted summary judgment on Rashada's Eighth Amendment claim.

### D.      Qualified Immunity on Eighth Amendment claim

Defendants also seek summary judgment on Rashada's Eighth Amendment claims based on the affirmative defense of qualified immunity. Under this defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

The existence of the qualified immunity inquiry involves two questions: whether the defendant violated a constitutional right and whether that right was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016). "On summary judgment, the court must analyze these questions after construing the facts in the light most favorable to the party asserting the injury and drawing all reasonable inferences in that party's favor." *Id*. When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).

Defendants present conclusory arguments that there is no clearly established law where any reasonable officer would have recognized that their actions infringed Rashada's rights stating, *i.e.*, that Rashada was disruptive on his escort by violating prison rules and by threatening staff, that defendants used reasonable force to escort a known violent prisoner back to his cell, and that they caused Rashada no injuries, or at the most, *de minimus* injuries. Defendants' Brief at PageID.91. Defendants' conclusory argument does not develop a qualified immunity defense for their actions taken against Rashada; it essentially repeats defendants' claim

13

that they did not violate Rashada's Eighth Amendment rights. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Accordingly, defendants' claim of qualified immunity should be denied.

### III. Recommendation

Accordingly, I respectfully recommend that defendants' motion for summary judgment (ECF No. 17) be **GRANTED** and that this case be **terminated**.

Dated: February 7, 2024                /s/ Ray Kent
                                       RAY KENT
                                       United States Magistrate Judge

**ANY OBJECTIONS** to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).